[No. 48295-1. En Banc. March 18, 1982.]

ELEANORA BALLASIOTES, *Appellant*, v. BOOTH GARDNER, *as County Executive*, ET AL, *Respondents.*

*Dolack, Hansler, Hulscher, Burrows, Dayhoff & Barline,* by *John W. Dayhoff,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Roger J. Miener, Chief Civil Deputy,* for respondents.

DORE, J.—The Committee Against Punch Card Election sought to compel the prosecuting attorney for Pierce County to ballot title a referendum on Pierce County Ordinance 81–21, passed by the Pierce County Council on July 7, 1981. Their cause was dismissed by the trial court and this appeal followed. Ordinance 81–21[1] authorized a con-

---

[1] Ordinance 81–21 provides:

"WHEREAS, the Operations Committee of the Pierce County Council has undertaken the task of investigating the feasibility of converting to punch card voting equipment for use in federal, state, county, city, town and district elections conducted within Pierce County; and

"WHEREAS, the committee has, over the course of five public meetings held between May 11 and June 15, 1981, conducted over seven hours of hearings, which hearings included input from the executive branch and also testimony from many members of the public; and

"WHEREAS, the committee has compared punch card voting against the alternative of remaining with the existing lever machine method; and

"WHEREAS, the Executive by letter of June 8, 1981, has recommended that Election Supplies Limited be selected as the lowest responsible bidder from among the bids previously received and opened April 13, 1981; and

"WHEREAS, procurement of new punch card voting equipment is expected to occur over a period of not more than five years, thereby requiring payment of funds from appropriations in subsequent fiscal years; Now, THEREFORE,

"BE IT ORDAINED by the Council of Pierce County:

"Section 1. The County Council hereby declares it to be the policy of Pierce County to phase out and convert from existing lever machine voting equipment to computer vote tallying/punch card equipment, provided that the County continue using the same type of absentee ballots as is being used now.

"Section 2. Election Supplies Limited is selected as lowest responsible bidder.

"Section 3. The Executive is empowered to execute the necessary agreements with the low bidder, Election Supplies Limited to accomplish a multi–year procurement over a period of not more than five years."

version in the county voting system from the existing lever machine voting equipment to a punch card voting/computer tallying system. The Council, in an effort to implement such ordinance, authorized an appropriation of $750,000 to cover the cost of acquiring the punch card system. The punch card voting equipment has been certified by the state voting machine committee (as required under RCW 29.33.040) as being in conformance with all statutory and administrative requirements.

Eleanora Ballasiotes, on behalf of The Committee Against Punch Card Election, timely filed a referendum petition with the Pierce County Auditor. The Auditor designated the referendum petition as Referendum 1 and forwarded it to the prosecuting attorney for ballot titling pursuant to section 5.70[2] of the Pierce County Charter. The prosecuting attorney declined to formulate a ballot title for the proposed referendum, announcing that the ordinance was exempt from the referendum process by the express language of section 5.60[3] of the Pierce County

---

[2]Subsections (2) and (3) of section 5.70 of the Pierce County Charter set forth the referendum procedures as follows:

"(2) Within five (5) days, excluding Saturday, Sunday, and holidays the filing officer shall confer with the petitioner to review the proposal as to form and style. The [f]iling [o]fficer shall give the referendum proposal a number, which shall thereafter be the identifying number for the measure. The filing officer shall then transmit a copy of the proposal to the Prosecuting Attorney, who within ten (10) days after receipt thereof shall formulate a concise statement, posed as a positive question, not to exceed twenty (20) words, which shall express and give a true and impartial statement of the measure being referred. Such concise statement will be the ballot title.

"(3) The petitioner then has one hundred twenty (120) days to collect the signatures of registered voters of the county equal in number to not less than eight percent (8%) of the number of votes cast in the County in the last Executive election. Each petition shall contain the full text of the measure being referred and the ballot title. The filing officer shall verify the sufficiency of the signatures on the petition, and if it is validated, submit the measure to the people at the next general election that is not less than one hundred twenty (120) days after the registering of the petition."

[3]Section 5.60 of the Pierce County Charter provides in its entirety as follows:

"The people reserve the power of referendum. A referendum may be ordered on any ordinance, or any section thereof, passed by the Council, except such ordi-

Charter. That section excepts from referendum "such ordinances as may be necessary for the immediate preservation of the public peace, health, safety, or support of the County government and its existing public institutions".

After petitioners filed a complaint, the Superior Court granted the prosecutor's motion for summary judgment, dismissing their cause of action. The court found the change from lever voting machine equipment to a punch card system was an administrative decision and was not subject to referendum. Additionally, the trial court held that funding the punch card system purchase was a legislative function, but that it was not referendable because it was within the (section 5.60) exception of ordinances for the "immediate . . . support of the County government and its existing public institutions".

For the purpose of this appeal, the parties agreed to the following stipulated facts:

1. The present voting machine equipment used in Pierce County provides an unofficial vote count at the precinct polling place. The proposed punch card system for the county does not provide an unofficial count at the precinct level.

2. As a result of (1) above, the precinct election officers from the respective major political parties and interested citizens there to witness the proceedings will not have knowledge of the election results in their precinct prior to the ballots leaving the precinct polling place.

3. The new punch card system requires physical transfer of the uncounted ballots from the precinct polling place to the counting center.

4. The counting center is run by county employees under the direct supervision of the Pierce County Auditor, an elected official of the county.

5. The counting center has complete control of com-

nances as may be necessary for the immediate preservation of the public peace, health, safety, or support of the County government and its existing public institutions. Upon registration and validation of a referendum petition, the measure will be ineffective pending the outcome of the referendum procedure. The registering of a referendum petition against one or more sections of any ordinance shall delay only those sections from taking effect."

puter programming and handling of the ballots.

6. Representatives of the major political parties and interested citizens are able to witness the counting process at the counting center.

7. The proposed punch card system for the county has received state certification and approval pursuant to RCW 29.33.030, *et. seq.*

8. There are currently 623 precincts in Pierce County and 274 polling places.

## DECISION

For the reasons stated below, we hold ordinance 81–21 is subject to referendum.

### I

We note initially that the prosecuting attorney overstepped the boundaries of his authority in refusing to ballot title Referendum 1. Section 5.70 of the Pierce County Charter, setting forth the applicable referendum procedures, requires the filing officer to give the referendum proposal an identifying number and transmit a copy of the proposal to the prosecuting attorney, "who within ten (10) days after receipt thereof *shall* formulate a concise statement, posed as a positive question, not to exceed twenty (20) words, which *shall* express and give a true and impartial statement of the measure being referred". (Italics ours.) As a general rule, the use of the word "shall" is imperative and operates to create a duty. *State Liquor Control Bd. v. State Personnel Bd.,* 88 Wn.2d 368, 377, 561 P.2d 195 (1977). The prosecuting attorney, therefore, lacked any discretion in ballot titling Referendum 1.

### II

For the purposes of clarity, we will discuss separately in turn each of the two components of the ordinance: (a) the decision to *implement* a punch card voting system; and (b) the decision to *fund* $750,000 to purchase equipment for the punch card computer system. We look first at the section of the ordinance which implements the punch card system.

Generally, the right to act directly through referen-

dum is not an inherent power of the people. The referendum power extends only to matters legislative in character as compared to *administrative actions. Leonard v. Bothell,* 87 Wn.2d 847, 557 P.2d 1306 (1976); *Ruano v. Spellman,* 81 Wn.2d 820, 505 P.2d 447 (1973). Thus, before the action switching to a punch card system can be subject to referendum, we must determine it to be a legislative action.

The criteria for determining when an act is legislative in nature are:

> Several criteria have been suggested for determining whether an act is legislative or administrative. One such is whether the subject is of a permanent and general character (legislative) or of temporary and special character (administrative). 5 E. McQuillin, *Municipal Corporations* § 16.55 (3d ed. rev. 1969). We believe a preferable standard, at least for this case, to be whether the proposition is one to make new law or declare a new policy, or merely to carry out and execute law or policy already in existence. *People v. Centralia,* 1 Ill. App. 2d 228, 117 N.E.2d 410 (1953); *Heider v. Common Council,* 37 Wis. 2d 466, 155 N.W.2d 17 (1967).

*Ruano,* at 823–24.

Justice Stafford, in *Durocher v. King Cy.,* 80 Wn.2d 139, 152–53, 492 P.2d 547 (1972), refers to the test posited in E. McQuillin, *Municipal Corporations* § 16.55, at 213 (3d rev. ed. 1969):

> Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative. . . .
>
> The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it.

We conclude that the ordinance action by the Council in the instant case is clearly a policy decision which will effect

a permanent change in the method of recording votes in Pierce County. Under the punch card system, the precinct officers' ability to have votes counted at the precinct level is lost. Also gone is the citizens' opportunity to witness the vote count at the precinct level. These factors are important checks and balances in the electoral process. The implementation of the punch card system will arguably increase the chances of election fraud, with no guaranty of increased or even equal accuracy. Additionally, there are invariably local issues and local elected positions on the ballot whose results will be delayed and not revealed to local voters under the punch card system until processed by the County Auditor.

We are not persuaded by the respondent's argument that there was no "act," either legislative or administrative, because the Council merely chose *not* to act to change the decision, which the executive branch of the County government had already made, to switch to the punch card voting system. Section 1 of ordinance No. 81–21 begins with the language, "The County Council hereby declares it to be the policy of Pierce County" to implement the punch card system. If the Council were merely deciding *not* to act, and to let the executive branch continue with a purely administrative task, it would have been unnecessary to "declare" the "policy" of the County. Additionally, if the executive branch may switch the method by which votes are cast and counted without a check or balance, it is difficult to perceive a decision which the executive branch could not reach on its own.

The prosecuting attorney argues that the executive power to acquire the new equipment would still remain unimpaired even if the ordinance were eliminated by the voters at a referendum election. The respondent contends that the *only* impact of a referendum vote against the ordinance would be to eliminate the authority given by the Council to the executive to enter into a contract to spread the financial impact of acquisition over subsequent fiscal years. This interpretation is contradicted by the language of the ordi-

nance and, if adopted, would expand the powers of the executive branch of Pierce County government to an impermissible degree. For these reasons, we reject respondent's arguments and hold that the decision to implement a punch card voting system in Pierce County was legislative in nature and subject to referendum.

## III

We turn next to the issue of whether the decision of the Pierce County Council to fund $750,000 to purchase equipment for the punch card voting system is subject to referendum under section 5.60 of the Pierce County Charter. Once again, it is necessary to determine whether this action was legislative or administrative in nature.

We agree with the trial court that the act of funding the new punch card system was legislative in character. This appropriation, not an item budgeted under the regular Pierce County budget, facilitates a permanent change in the way Pierce County citizens vote. It is inequitable to demand $750,000 from the citizens of Pierce County without allowing them the chance to voice their opinion on whether or not that money should be used to change their method of voting.

Article 2, section 1(b)[4] of our state constitution, excepts from the power of referendum "such laws as may be necessary for the immediate preservation of the public peace, health or safety, [or] support of the state government and its existing public institutions, . . ." Section 5.60 of the Pierce County Charter contains a virtually identical exception for "such ordinances as may be necessary for the

---

[4]Article 2, section 1(b) states in its entirety:

"(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted. *Six per centum, but in no case more than thirty thousand, of the legal voters shall be required to sign and make a valid referendum petition.*"

immediate preservation of the public peace, health, safety, or support of the County government and its existing public institutions".

We disagree with the trial court, however, that the decision to fund the punch card equipment, although legislative in character, falls under the "support of County government" exception to the referendum power, making it immune to the referendum process.

■ We recognize the broad definition of "support" in interpreting the state constitution as found in the early case of *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 P. 28 (1915), and the more recent line of cases exemplified by *State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110 (1973). In determining what meaning to give the word "support" in exception to the referendum power of the people, however, each case must be treated individually. The *Blakeslee* case dealt with a bill appropriating money for a public highway, and the bill discussed in *Helm* appropriated funds for salaries established by the Governor. Highways and salaries are arguably much more vital to state government than the replacement of adequate voting machines to county government. Additionally, this ordinance is both an appropriations bill and a decision to make a permanent change in the voting method. As such it is not "necessary" for the support of County government or its existing institutions, as there is no question but that the existing voting machine equipment adequately serves the County and accurately counts the votes. We, therefore, find the "support" exception inapplicable in this case.

For the reasons stated above, we hold that the decision to implement a punch card voting system in Pierce County is "legislative" in character and is referendable by a vote of the people. We further hold the trial court erred in ruling that the decision to fund the purchase of the punch card system falls under the "support of County government" exception to the referendum power.

We reverse and remand to the trial court for proceedings

consistent with the provisions of this opinion.

ROSELLINI, DOLLIVER, WILLIAMS, and DIMMICK, JJ., concur.

UTTER, J. (dissenting)—The majority confuses legislative judgment about the merits of Pierce County's decision to change to a punch card voting system with its judicial role of determining whether a referendum is constitutionally authorized in this case. The majority states: "Highways and salaries are arguably much more vital to state government than the replacement of adequate voting machines to county government." Majority opinion, at 199. Whether that is true or not is irrelevant to our present inquiry. Our judicial function in deciding whether a referendum is constitutionally authorized does not involve an inquiry into the merits of the legislative decision. If it did, then the referendum process itself would be superfluous: we, and not the people, could serve as the final arbiters of the dispute.

The majority finds ordinance 81–21 not "'necessary' for the support of County government or its existing institutions, as there is no question but that the existing voting machine equipment" is adequate. Majority opinion, at 199. In making this statement, the majority puts a new focus on judicial inquiry with regard to the "support of . . . existing public institutions" exception contained in article 2, section 1(b) of the Washington State Constitution. "The real controversy", as the court in *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 263, 148 P. 28 (1915) stated, "revolves around the words 'support' and 'public institutions.'" In a long line of cases, we have left to the legislative body the question of what is "necessary." *State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110 (1973). *See, e.g., State ex rel. Hoppe v. Meyers,* 58 Wn.2d 320, 363 P.2d 121, 100 A.L.R.2d 304 (1961); *State ex rel. Pennock v. Reeves,* 27 Wn.2d 739, 179 P.2d 961 (1947), *overruled on other grounds, State ex rel. Pennock v. Coe,* 42 Wn.2d 569, 257 P.2d 190 (1953); *State ex rel. Case v. Howell,* 85 Wash. 281,

147 P. 1162 (1915); *State ex rel. Brislawn v. Meath,* 84 Wash. 302, 147 P. 11 (1915); *State ex rel. Blakeslee v. Clausen, supra.* The Pierce County Council's decision to change the method of voting was not a meaningless act, and we should not second–guess its judgment by labeling its decision to fund the punch card system "unnecessary."

Its decision was in support of the existing public institution of administering the electoral process. The term "support" should be read broadly. As we stated in *Blakeslee, supra* at page 270:

> The intent and purpose of the people, as gathered from the words of the constitution and the circumstances attending the adoption of the seventh amendment, impels the holding that the people intended to use the word "support" in its fullest sense. When so considered, "support" includes appropriations for current expenses, maintenance, upkeep, continuation of existing functions, as well as appropriations for such new buildings and conveniences as may be necessary to meet the needs and requirements of the state in relation to its existing institutions.

The Council conducted numerous public hearings on the issue. While undoubtedly the two methods of vote tabulation have their individual merits, the Council felt it was in the best interests of the County and the administration of the voting process to make the change. Since ordinance 81–21 supports one of the County's existing institutions, it falls within the second exemption of Const. art. 2, § 1(b).

Application of this long–standing interpretation of "support" does not create an exception that engulfs the rule. As we stated in *Blakeslee,* at page 271:

> It does not follow that a referendum may not be had of a law, or any part of a law, carrying an appropriation. If a law were passed bringing the state into a new activity, or providing for a new function so that it might be fairly said that it did not pertain to the support of the government as then organized or to any *existing* institution, as for instance, a law like the one creating the industrial insurance commission, the law creating a railroad commission, or a law establishing an entirely new institution,

the rejection of the law would cause a lapsation of the appropriation.

Not even the majority contends that ordinance 81–21 creates a "new" public institution. The ordinance merely modifies the method by which an existing institution will be administered. If the Council were to create a new public institution, the ordinance would be subject to referendum unless it were to fall within the other exception contained in article 2, section 1(b)—those acts "necessary for the immediate preservation of the public peace, health or safety . . ." *See State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 380 P.2d 735 (1963).

While I agree with the majority that the entire ordinance is legislative in character,[5] I believe it errs in authorizing a referendum by failing to follow our previous cases and in applying the wrong standard for whether ordinance 81–21 falls within the constitutional exception for legislative acts "in support of . . . existing public institutions". Our present role is not one of determining which of the two voting systems is best for Pierce County; nor is it even one of determining whether the Pierce County Council's acts were arbitrary, capricious or contrary to law. We are here solely to decide whether a referendum is constitutionally authorized in this context. I submit it is not. The people of Pierce County are not without recourse. They may avail themselves of the very punch cards that are the cause of this dispute.

BRACHTENBACH, C.J., and STAFFORD, J., concur with UTTER, J.

---

[5]I also agree with the majority that the prosecutor had no discretion to refuse to ballot title appellant's proposed referendum. Nevertheless, since the issue of constitutional authorization for a referendum is before us, I—like the majority—reach the substantive question.